**Green v New York City Health & Hosps. Corp.**

2025 NY Slip Op 33010(U)

August 5, 2025

Supreme Court, Kings County

Docket Number: Index No. 502450/2022

Judge: Consuelo Mallafre Melendez

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

**At an IAS Term, Part MMESP7 of the Supreme Court of the State of NY, held in and for the County of Kings, at the Courthouse, at 360 Adams Street, Brooklyn, New York, on the 5th day of August 2025.**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF KINGS
-------------------------------------------------------------------------X
JENNIFER GREEN, as Administratrix of the Estate of HELEN GANDY Individually,

                                  Plaintiff,

     -against-

NEW YORK CITY HEALTH & HOSPITALS
CORPORATION and SEA CREST NURSING and
REHABILITATION CENTER,

                               Defendants.
-------------------------------------------------------------------------X

**DECISION & ORDER**

Index No. 502450/2022
Mo. Seq. 6

**HON. CONSUELO MALLAFRE MELENDEZ, J.S.C**.

Recitation, as required by CPLR § 2219 [a], of the papers considered in the review:

<u>NYSCEF #s:</u> 114-131, 136-140, 141

Defendant New York City Health & Hospitals Corporation ("NYCHHC," "NYCHHC Coney Island Hospital," or "Coney Island Hospital") moves for an Order pursuant to CPLR 3212 granting summary judgment on the basis that NYCHHC is immune from liability under New York's Emergency or Disaster Treatment Protection Act, N.Y. Pub. Health Law §§ 3080-3082 ("EDTPA"), and/or granting summary judgment on the merits, and dismissing Plaintiff's claims for wrongful death, lack of informed consent, negligent hiring/retention/supervision/training, and violations of the Public Health Law.

Plaintiff Jennifer Green ("Plaintiff"), as Administrator of the Estate of Helen Gandy ("Decedent"), opposes NYCHHC's motion.

[* 1]

On March 9, 2021, Decedent served a Notice of Claim relating to her treatment at NYCHHC Coney Island Hospital between July 22, 2020, and December 18, 2020, alleging claims of negligence, carelessness, and medical malpractice relating to the development and deterioration of pressure ulcers at NYCHHC Coney Island Hospital. Thereafter, Decedent passed away and Plaintiff commenced this action by filing a Summons and Complaint on January 25, 2022. Plaintiff asserted causes of action in medical malpractice, wrongful death, violations of Pub. Health Law § 2801, lack of informed consent, and negligent hiring, retention, supervision, and training in connection to the treatment of Decedent at Coney Island Hospital.

Plaintiff alleges, *inter alia*, that NYCHHC through its staff failed to properly and adequately assess Decedent's high risk for developing pressure ulcers and deep tissue injuries, failed to recognize the progression in her skin impairments, failed to intervene with appropriate treatment and preventative measures, failed to provide adequate nutritional support to allow the healing of the wounds, failed to timely transfer Decedent to a facility that could provide effective and proper care, and failed to recognize the severity of Decedent's overall medical condition and degree of impairment.

Decedent, who was 84 years old at the time of the events in question, was first admitted to NYCHHC Coney Island Hospital from July 31, 2020, through August 6, 2020. This was followed by subsequent admissions from November 22, 2020, through December 2, 2020, and from December 6, 2020, through December 18, 2020. When Decedent was discharged from NYCHHC on August 6 and December 2, she was admitted to non-moving Defendant Sea Crest Nursing and Rehabilitation Center ("Sea Crest") from August 6, 2020, through November 22, 2020, and from December 2, 2020, through December 6, 2020.

[* 2]

On July 31, 2020, Decedent presented to NYCHHC Coney Island Hospital for her first admission with prior medical history of diabetes, mellitus, asthma, chronic kidney disease, chronic obstructive pulmonary disease, dementia, hypertension, lung cancer post-chemotherapy in 2006, and prior cerebrovascular accident. NYCHHC administered a Braden Scale Assessment which revealed a score of 16, indicating a mild risk for skin breakdown. Decedent was also negative for any pressure injuries after skin examination.

After becoming suitable for discharge on August 6, 2020, Decedent was transferred to Sea Crest, where upon admission, they confirmed she did not have any pressure ulcers. Decedent stayed at Sea Crest until November 22, 2020, when she had an incident of respiratory distress and required emergency transfer back to NYCHHC Coney Island Hospital.

Upon this second admission to NYCHHC on November 22, 2020, hospital records indicate that Decedent had redness on both heels and a stage II sacral pressure ulcer. A Braden Scale assessment revealed a score of 11, indicating that Decedent was at high risk for skin breakdown, and that her condition had worsened since her first admission on July 31, 2020. These three wounds were all recorded as pre-existing, relative to her second admission at NYCHHC Coney Island Hospital. The sacral pressure ulcer measured approximately 1 x 0.5 x 0.1 cm upon her second admission to the hospital.

On November 25, 2020, the sacral pressure wound measured approximately 3 x 2 x 0.1 cm, and it was noted as "not improving" during this time. The medical records documented that the sacral pressure ulcer was to be treated with normal saline, Vaseline gauze, hydrogel, and a foam dressing. There was no ulcer noted for the left heel, but Decedent's right medial heel was documented with "erythema blanchable" and the recorded care plan was to continue pressure

3

injury prevention and apply tincture of Benzoin and barrier cream, offload the site, provide a heel pad; and use Biatain silicone foam dressing for pressure injury prevention.

Progress notes recorded on November 25, 2020, reveal that Decedent was noted to have high malnutrition risk. On November 28, medical records note that NYCHHC performed a Braden Scale Assessment revealing a score of 16, indicating a mild risk for skin breakdown. Later, on December 1, the medical records documented the sacral pressure wound to measure approximately 2 x 1.5 x 0.1 cm and noted a right heel pressure injury, which was also classified as a deep tissue injury, measuring 2 x 1.5 x 0 cm with an intact wound bed. This note from NYCHHC on December 1, 2020 was not input into Decedent's chart until December 4, 2020, two days after her second discharge from Coney Island Hospital.

On December 2, 2020, Decedent was cleared for discharge back to Sea Crest, where she remained until December 6, 2020. On December 2, 2020, Sea Crest performed a Braden Scale assessment, revealing a score of 11, indicating high risk for skin breakdown. On that day, her prior stage II sacral pressure ulcer was reclassified as stage III and measured 4 x 3.5 x 0.3 cm. This skin examination also revealed stage II right and left buttock pressure ulcers measuring 1 x 1 cm each, which were not previously recorded at NYCHHC.

On December 6, 2020, Decedent experienced more respiratory distress and was emergently transferred back to NYCHHC Coney Island Hospital. Upon admission to Coney Island, medical records documented "pressure injuries to the sacrum, right heel, and right lateral ankle." Medical records also documented a Braden Scale assessment revealing a score of 8, indicating a high risk for skin breakdown.

The December 7, 2020, note from NYCHHC describes a stage III sacral pressure ulcer measuring approximately 2 x 1.5 x 0.1 cm, marking a shift in the wound from stage II to stage

4

III. The note also describes the right heel pressure injury and deep tissue injury as measuring 2 x 2 x 0 cm, and marks the measurements of Decedent's new right ankle deep tissue injury pressure injury as 1.5 x 1.5 x 0 cm.

On December 14, 2020, four days prior to Decedent's final discharge from NYCHHC Coney Island Hospital, medical records noted an assessment which revealed Decedent's Braden Scale score was 14. The December 14, 2020, medical record noted the three measurements of her pressure injuries: the sacral pressure ulcer measured approximately 3 x 3 x 1 cm and was noted as being stage III or IV, the right heel deep tissue injury measured 1.5 x 1.5 x 0 cm, and the right ankle deep tissue injury measured 2.5 x 2.5 x 0 cm. These measurements indicate increases in size of the pressure wounds to Decedent's sacrum and right ankle, and a decrease in the size of the wound to her right heel. The wound care plan recorded for Plaintiff Decedent's sacral pressure ulcer was that it was to be cleansed with normal saline, zinc barrier was to be applied, and then to be covered with a foam dressing. As for the right heel pressure injury, a tincture of Benzoin was to be applied to the right heel and to be left open to the air with no foam dressing. Lastly, the note recorded that the right lateral ankle and right heel deep tissue injuries were non-healing; no wound care recommendation was documented.

Decedent's last Braden Assessment on December 18, 2020 before discharge showed a score of 15, indicating slightly higher risk of skin breakdown than when she was first admitted to Coney Island Hospital.

Throughout her care at NYCHHC Coney Island Hospital, hospital staff noted wound order recommendations for a low air loss mattress, prevention methods for keeping pressure off Decedent, heel pads, and incontinence/moisture management recommendations. However, Decedent's final discharge note from NYCHHC documents a stage III sacral pressure ulcer and

5

two deep tissue injuries on her right heel and right lateral ankle, indicating that since the injuries were first recorded, they had worsened in terms of measurement and severity.

On December 18, 2020, Decedent was discharged from NYCHHC Coney Island Hospital with instructions for "stage III sacral pressure ulcer to be cleansed with normal saline, zinc barrier, and a foam dressing; a right heel deep tissue injury to be treated with tincture of Benzoin; and a right lateral ankle deep tissue injury to be treated with tincture of Benzoin."

Decedent was transferred to non-party Palm Gardens Nursing Home, where she would remained until June 8, 2021, when she was discharged to non-party Mount Sinai for hypotension and suspected sepsis. On June 11, 2021, Decedent passed away at Mount Sinai from cardiac arrest.

The Court first considers the movant's argument that they are immune from liability under the EDTPA (Pub. Health Law former art. 30-D, §§ 3080-3082). This act was enacted and signed into law at the height of New York's inundation and response to the COVID-19 pandemic in April 2020, and in the context of a host of executive orders declaring a statewide public health emergency. Recognizing the treatment of patients with COVID-19 as a "matter of vital state concern," the act afforded broad liability protections to health care facilities and professionals "from liability that may result from treatment of individuals with COVID-19 under conditions resulting from circumstances associated with the public health emergency." The act was effective retroactively to March 7, 2020. Subdivision (1) of former Pub. Health Law § 3082 reads:

> "1. Notwithstanding any law to the contrary, except as provided in subdivision
> two of this section, any health care facility or health care professional shall have
> immunity from any liability, civil or criminal, for any harm or damages alleged to

6

[* 6]

have been sustained as a result of an act or omission in the course of arranging for or providing health care services, if:

(a) the health care facility or health care professional is arranging for or providing health care services pursuant to a COVID-19 emergency rule or otherwise in accordance with applicable law;

(b) the act or omission occurs in the course of arranging for or providing health care services and the treatment of the individual is impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives; and

(c) the health care facility or health care professional is arranging for or providing health care services in good faith." (Pub. Health Law former art. 30-D, § 3082 [1].)

Subdivision (2) of the statute provided an exception wherein facilities and providers could be held liable for "willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm . . . provided, however, that acts, omissions, or decisions resulting from a resource or staffing shortage shall not be considered to be willful or intentional criminal misconduct, gross negligence, reckless misconduct, or intentional infliction of harm."

At the time of enactment, Pub. Health Law § 3081 (5) defined "health care services" broadly to include "the care of any individual who presents at a health care facility or to a health care professional during the period of the COVID-19 emergency declaration," and that version of the statute remains the applicable law for patients treated from March 7, 2020, until August 3, 2020 (*see* L 2020, ch 56, pt. GGG; *Mera v. New York City Health and Hosps. Corp.*, 220 AD3d 668, 669-670 [2d Dept 2023]; *Ruth v. Elderwood at Amherst*, 209 AD3d 1281 [4th Dept 2022]).

The movant quotes the EDTPA in their attorney affirmation, as well as Governor Cuomo's Executive Order 202.10. Of note, the First Department and many lower courts have

7

[* 7]

found that Executive Order 202.10 need not be considered as providing an "independent basis for complete immunity," as the EDTPA was essentially "a codification of the immunity contained in Executive Order 202.10, such that the Executive Order was 'subsumed' into the EDTPA." (*Holder v. Jacob*, 231 AD3d 78, 89-90 [1st Dept 2024] [internal citations omitted]).

Under the second version of Pub. Health Law §§ 3081 and 3082, effective August 3, 2020, the legislature narrowed the scope of the EDTPA and removed the subclause reading: "any individual who presents at a health care facility." From that date forward, the act applied only to health care services specifically relating to "(a) the diagnosis or treatment of COVID-19, or (b) the assessment or care of an individual as it relates to COVID-19, when such individual has a confirmed or suspected case of COVID-19." (*See* L 2020, ch 134; *Lara v. S&J Operational, LLC*, 237 AD3d 1186, 1188 [2d Dept 2025]).

The EDTPA was repealed on April 6, 2021. The bill contained no express language on whether the repeal was retroactive, but all four Appellate Divisions have consistently held that the repeal was not retroactive and that the act remains in force for claims that arose before the repeal date. Thus, covered health care facilities and professionals are still immune from liability with respect to treatment and care rendered on the dates when the original and amended versions of the EDTPA were in effect. (*See Gonnelly v. Newburgh Operations, LLC*, 236 AD3d 866, 868 [2d Dept 2025]; *Damon v. Clove Lakes Healthcare and Rehabilitation Ctr., Inc.*, 228 AD3d 618, 619 [2d Dept 2024]).

NYCHHC argues that some or all claims against them should be dismissed on the basis that they are immune from liability under the EDTPA. Plaintiff does not raise an opposition as to NYCHHC's immunity under the EDPTA. Nevertheless, the application of immunity under the

8

[* 8]

EDTPA is a statutory matter, and it is the movant's burden to establish their entitlement to immunity before any burden shifts to the non-moving party (*see Gonnelly* at 868).

In a motion to dismiss based on EDPTA immunity, the moving defendant must demonstrate "that the conditions for its entitlement to immunity under the EDTPA were satisfied" (*Gonnelly* at 868). It is essentially the defendant's burden to establish prima facie that (1) the defendant was a health care facility or professional acting in good faith; (2) the alleged acts or omissions occurred in the course of providing "health care services" (under the applicable definition of former Pub. Health Law § 3081 [5]) during the COVID-19 emergency period; and (3) "the treatment of the individual is impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives" (Pub. Health Law §§ 3082 [1]).

To establish an "impact" of COVID-19 on the healthcare facility, movants generally must provide submissions such as affidavits from parties with personal knowledge of treatment at the facility that was impacted (*see Lara v S&J Operational, LLC,* 237 AD3d 1186, 1188 [2d Dept 2025]; *Mera v New York City Health and Hosps. Corp.,* 220 AD3d 668, 670 [2d Dept 2023]). The movant may also offer records or testimony demonstrating the impact of COVID-19 on the patient's treatment (*see Martinez v NYC Health and Hosps. Corp.,* 223 AD3d 731, 732 [2d Dept 2024] [the pleadings and 50-h hearing transcript "conclusively established" that the treatment of a patient, who was diagnosed with and died from COVID-19 in March-April 2020, was covered by the EDTPA]).

When discussing Decedent's first admission at Coney Island Hospital from July 31, 2020, to August 6, 2020, the movant does not address the post-amendment version of the EDTPA and

[* 9]

argues solely that they are immune from liability under the pre-amendment version of the law, which was in effect until August 3, 2020.

The EDTPA, as effective during Decedent's first admission, provided broad immunity to health care providers for alleged harm which occurred during the COVID-19 emergency declaration. Its definition of "health care services" applied broadly to include "the care of *any individual who presents at a health care facility* or to a health care professional" during the emergency declaration. Such is the case for Decedent's presentation on July 31, 2020. Therefore, the movants have made a showing that any alleged acts and omissions from July 31-August 3, 2020 occurred in the course of providing health care services in good faith.

Notwithstanding, the movants made no reference in their papers to any evidence of "impact" of COVID-19 on the patient's treatment during the first admission. They submitted no affirmation regarding any impact – positive, negative, or neutral – and did not cite to any relevant medical records or testimony regarding July 31-August 2, 2020. Therefore, they did not meet their burden of demonstrating that her treatment during that admission was "impacted by the health care facility's or health care professional's decisions or activities in response to or as a result of the COVID-19 outbreak and in support of the state's directives."

Furthermore, when the EDTPA was amended on August 3, 2020, the legislature provided that the amendment would take effect immediately and "apply to claims for harm or damages if the act or omission that causes such harm or damage occurred on or after such effective date" (L 2020, ch 134, § 3; *see Ruth v Elderwood at Amherst,* 209 AD3d 1281 [4th Dept 2022]). The post-amendment EDTPA narrowed its scope to acts and omissions which occurred in the course of COVID-19 diagnosis, treatment, or "the assessment or care of an individual as it relates to

10

[* 10]

COVID-19." There has been no showing by the movants that Decedent's treatment from August 3 – August 6 is covered by the amended law.

Accordingly, the movants have not met their prima facie burden of establishing they that are immune from liability on the basis of the EDTPA, as to any claims arising from Decedent's first admission, and that part of the motion is **denied.**

When discussing Plaintiff's claims for Decedent's November 22, 2020, and December 6, 2020, hospitalizations, the movant addresses the post-amendment version of the EDTPA, which took effect on August 3, 2020 and was effective until its repeal in April 2021. The amended version of Pub. Health Law § 3082 still conferred immunity from civil liability "for any harm or damages alleged to have been sustained as a result of an act or omission in the course of providing health care services," so long as those services were provided in good faith and impacted by the COVID-19 outbreak.

However, the definition of "health care services" in Pub. Health Law § 3081 was amended to read:

> "5. The term 'health care services' means services provided by a health care facility or a health care professional, regardless of the location where those services are provided, that relate to:
> (a) the *diagnosis or treatment* of COVID-19; or
> (b) the assessment or care of an individual *as it relates to COVID-19*, when such individual has a confirmed or suspected case of COVID-19." (Pub. Health Law § 3081 [5] [emphasis added].)

The amendment's intention to narrow the scope of immunity is clear, as the legislature not only removed subsection (c) ("any other individual who presents at a health care facility") entirely,

11

but also removed "prevention" from subsection (a) and added the "as it relates to COVID-19" language to subsection (b).

The evidence offered by the movant as to the relation and "impact" of COVID-19 on NYCHHC from the period of November 22, 2020 – December 2, 2020, included medical records demonstrating that Decedent was screened and tested for COVID-19, was instructed to wear a facemask, and her care plan included airborne, contact, and droplet isolation measures. The movant also offers testimony from Plaintiff stating that she was given a "one-day pass" and her visitation was limited "because of COVID." Decedent never tested positive for COVID-19 during this admission.

As to Decedent's third hospitalization from December 6, 2020 to December 18, 2020, the movant cited to medical records which stated "rule out COVID pneumonia" on Decedent's admission history, a reference to her room door being closed for continued isolation protocols, and two screenings for COVID-19. Again, Decedent did not test positive for COVID-19 during this admission.

Additionally, the movant cites to the deposition of Nataliya Borys, R.N., who testified in her deposition that 2020 was "special" because "it was COVID time, we had a lot of patients" when she was asked about making rounds on the floor and reviewing notes.

The Court finds that the movant's submissions are insufficient to demonstrate that the patient's treatment was impacted by COVID-19 during her November-December 2020 admissions. The movant does not offer an affirmation from a party with personal knowledge of the patient's treatment or the overall impact of COVID-19 on the hospital staff and resources during that time. The minimal evidence offered is a handful of references to COVID-19 testing and masking in the medical record and vague, equivocal statements from the nurse that the

12

[* 12]

hospitalizations occurred during 2020 when there were "a lot of patients." The movant's submissions do not constitute a prima facie showing that her wound care/pressure ulcer treatment was impacted by "decisions or activities in response to or as a result of the COVID-19 outbreak."

Even if the Court accepts these records and testimony as a showing of the "impact" of the COVID-19 pandemic, the movants have failed to show that the claims in this action from Decedent's November-December 2020 hospital admissions arise from "an act or omission in the course of providing health care services" within the meaning of the post-amendment EDTPA.

Applying the post-amendment EDPTA, none of the alleged malpractice here – as it relates entirely to the prevention and treatment of pressure ulcers – involved either "the diagnosis or treatment of COVID-19" or "the assessment or care of an individual as it relates to COVID-19, when such individual has a confirmed or suspected case of COVID-19" (Pub. Health Law § 3081).

As noted above, Decedent was never diagnosed or treated for COVID-19 during either admission from November-December 2020. The mere fact Decedent was negatively "screened" for COVID-19 exposure on admission and that she was tested with a nasal swab does not demonstrate she had a "suspected case" of COVID-19, and even if she was such an individual, her treatment for pressure ulcers was not "assessment and care as it relates to COVID-19." The "relates to" language was specifically added to subsection (b) to distinguish it from the pre-amendment version, which simply read "the assessment and care of an individual with a confirmed or suspected case of COVID-19."

In sum, the Court finds the movant's submissions have not established that Decedent's treatment in this case involved diagnosis, treatment, or assessment and care related to COVID-19, nor that her treatment was impacted by the hospital's response to the pandemic. Thus, the

13

[* 13]

part of the motion seeking summary judgment on the basis of EDTPA immunity, as to Decedent's second and third admission to Coney Island Hospital in November-December 2020, is **denied.**

The Court now turns to the merits of Plaintiff's claims for medical malpractice during her three admissions to Coney Island Hospital.

In evaluating a summary judgment motion in a medical malpractice case, the Court applies the burden shifting process as summarized by the Second Department: "[A] defendant must make a prima facie showing either that there was no departure from good and accepted medical practice, or that the plaintiff was not injured by any such departure. Once a defendant physician has made such a showing, the burden shifts to the plaintiff to demonstrate the existence of a triable issue of fact, but only as to the elements on which the defendant met the prima facie burden. Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions." (*Rosenzweig v. Hadpawat*, 229 A.D.3d 650, 652 [2d Dept 2024] [internal quotation marks and citations omitted]). However, "expert opinions that are conclusory, speculative, or unsupported by the record are insufficient to raise triable issues of fact." (*Barnaman v. Bishop Hucles Episocal Nursing Home*, 213 A.D.3d 869, 898-99 [2d Dept 2023]).

In support of their motion for summary judgment, NYCHHC submits an expert affirmation from Lawrence N. Diamond, M.D., a physician licensed in the State of New York who has first-hand experience with the standard of care in this case.

Dr. Diamond broadly opines that there were no departures in the standard of care by NYCHHC Coney Island Hospital with the treatment of Decedent Helen Gandy, and that none of the patient's wounds were "hospital acquired." As an initial matter, Dr. Diamond notes that no

14

[* 14]

pressure injuries developed during the first admission to NYCHHC Coney Island Hospital from July 31-August 6, 2020. She was discharged to Sea Crest on August 6 with no pressure ulcers, as documented in both the Coney Island Hospital and Sea Crest records.

Dr. Diamond opines that when Decedent was transferred to NYCHHC for her second admission on November 22, the stage II sacral ulcer and right heel redness, which would later develop into long-lasting pressure injuries, were pre-existing. Dr. Diamond also states that no further pressure injuries developed during the patient's time at NYCHHC Coney Island Hospital.

Dr. Diamond opines, based on the record and nursing sheets, that Decedent's sacral ulcer and right heel ulcer were appropriately assessed and treated in compliance with the standard of care, including by cleansing and dressing the wounds, providing wedge cushions and a specialty air mattress, and turning and repositioning every two hours.

On the claim that NYCHHC failed to order and perform debridement procedures for Decedent's pressure ulcers, Dr. Diamond opines in support of NYCHHC. Dr. Diamond opines that debridement was not necessary, and would have been contraindicated, because there were no infected wounds and no necrosis. Dr. Diamond broadly opines that any claims that Coney Island Hospital failed to treat infected wounds are also false, because no wounds became infected, and antibiotics were explicitly ordered for Decedent's urinary tract infections. Dr. Diamond opines that claims that the hospital failed to have and enforce policies concerning pressure injury treatment are speculation and ignore the pages of documentation they provided for Decedent.

Dr. Diamond also addressed other "false claims," namely the allegation that NYCHHC Coney Island Hospital failed to assess and document Decedent's risk for developing pressure ulcers upon admission and under its care. In his view, while measurements did vary with the sacral pressure ulcer and there was "one single reference to it being Stage III," the care seen from

15

Coney Island Hospital was appropriate and documented and therefore, there was no violation of the standard of care. Dr. Diamond similarly opines that the allegation that no specialty surfaces were provided is also inaccurate because low air loss mattresses, heel offloading and the "TAP program (positioning wedge)" were documented in the chart.

On the issue of proximate causation, Dr. Diamond opines that Decedent was "profoundly ill" and of "advancing age," which explains the physiological changes to her skin and immune system seen throughout her treatment that led to the development of her injuries. From this baseline, Dr. Diamond opines that the wounds she would experience during her time at NYCHHC were progressive, incurable and "unavoidable," and developed despite the facility's appropriate care assessment. Dr. Diamond defines "unavoidable wounds" as ones that develop regardless of a facility evaluating the patient's condition and pressure ulcer risk factors, implementing interventions consistent with patient's needs and monitoring their impact, and revising their approach as appropriate. The expert opines that Decedent's injuries resulted from Decedent's physiological changes rather than any departures from the standard of care by Coney Island Hospital.

Dr. Diamond addresses other allegations, including those referring to Decedent's malnutrition, opining that there is no clinical evidence that she was malnourished because of NYCHHC's care and that her nutrition note of December 18, 2020, states that her malnutrition was due to her chronic illness rather than any care she received.

Lastly, Dr. Diamond opines as to the wrongful death claim, stating that "the Mount Sinai records indicate that Decedent died on June 11, 2021 due to cardiac arrest at the age of 84," and there is no causal connection between her death and pressure ulcers.

16

[* 16]

Based on evaluation of the submissions, Dr. Diamond has met the prima facie burden of establishing that Decedent did not develop any pressure ulcers during her first admission in July-August 2020, and therefore, Plaintiffs' claims that their alleged departures from the standard of care proximately causing the development of pressure ulcers during that admission should be dismissed.

However, as to the second and third admissions in November-December 2020, the expert states in a conclusory manner that the patient "did not develop any new wounds" and that "the allegation that the wounds progressed is also untrue." The record shows that pressure ulcers on her sacrum, buttocks, and heels were first documented during her Coney Island Hospital admission or upon her December 2 discharge and readmission to Sea Crest, and it is disputed between the parties where these injuries developed. Thus, the Court finds the movant's expert opinions on these admissions is conclusory and he fails to address significant parts of the record.

Notwithstanding, a defendant may establish their entitlement to summary judgment on the basis that the hospital complied with the standard of care, *or* that even if the alleged departures occurred, they did not proximately cause the plaintiff's claimed injuries (*Stukas v Streiter,* 83 AD3d 18, 26-27 [2d Dept 2011]). Dr. Diamond establishes the movant's prima facie entitlement to summary judgment on the issue of proximate causation, setting forth that Decedent's pressure ulcers and signs of malnutrition were the result of her comorbidities and not any departure from the standard of care by the movants. Further, the expert establishes that Decedent's death was not proximately caused by the alleged departures. The expert opines, based on his review of the record, that her death from cardiac arrest in June 2021 was unrelated to any development or progression of pressure ulcers

17

[* 17]

As a causal link between the defendant's malpractice and Decedent's death is an essential part a "wrongful death" claim, NYCHHC also establishes their prima facie entitlement to summary judgment on that cause of action. The burden therefore shifts to Plaintiff to raise an issue of fact.

In opposition, Plaintiff submits expert affirmations from a registered nurse licensed to practice nursing in the State of New York, [name of expert redacted], with experience in treating pressure injuries and assessing patients. The unredacted, signed expert affirmations were presented to the Court for *in camera* inspection.

Plaintiff's nursing expert opines that NYCHHC Coney Island deviated from the standard of care. Plaintiff's nursing expert broadly opines that Decedent developed pressure ulcers during her admissions to NYCHHC Coney Island Hospital as a result of the negligent care rendered by the nursing staff. Plaintiff's nursing expert focuses on Decedent's second admission, where they say the patient developed pressure ulcers on her sacrum, left and right heel, and her left and right buttock.

In response to the movant's contention that Decedent's injuries were pre-existing upon admission and not "hospital-acquired," Plaintiff's nursing expert notes that the sacral ulcer and right heel redness were documented for the first time at NYCHHC Coney Island Hospital. Plaintiff's nursing expert also cites Sea Crest's chart from December 4, 2020 which refers to the stage III pressure ulcer, the right heel deep tissue injury, and the right ankle wound as "hospital acquired," indicating that these wounds developed at NYCHHC Coney Island during the second admission.

Plaintiff's nursing expert opines on specific ways in which the staff deviated from the standard of care including, failing to assess and evaluate Braden Scale assessments properly and

18

[* 18]

failing to reposition Decedent every two hours. In the expert's view, the medical records indicate that NYCHHC failed to adhere to the repositioning guidelines in Decedent's plan of care, which indicates a deviation from the standard of care. Plaintiff's nursing expert opines that the Braden Score assessment of 16 on November 28 and the date of decedent's discharge on December 2, 2020, which indicates that she was not at a high risk for skin breakdown, was improper. The nurse opines that, given Decedent's limited mobility, dementia, and reliance on the hospital staff, she should have been evaluated by the nursing staff as high risk for skin breakdown.

Plaintiff's nursing expert opines that NYCHHC staff failed to consistently document the wounds and interventions, impairing Decedent's caregivers' ability to adequately treat her. For example, the expert emphasizes the fact that the note from December 1, 2020, documenting Decedent's pressure injuries from her second admission to the hospital was not input into Decedent's chart prior to her transfer to Sea Crest. In their view, this error failed to put the staff at Sea Crest on notice of Decedent's skin impairments, which constituted a departure from the standard of care.

Plaintiff's nursing expert opines that Decedent's prior conditions should have alerted the hospital staff of her high risk for malnutrition and increased the level of care they devoted to her. Plaintiff's nursing expert opines that she should have been deemed as a high risk for malnutrition upon each admission to the hospital, but that her Braden Score assessments did not accurately reflect this risk. Plaintiff's nursing expert also notes records from December 2, 2020, that Decedent had low albumin levels of 2.3, and opined that compared to her albumin levels prior to admission to the hospital, which measured 3.6, malnutrition is evident. The expert further notes her weight difference before and after admission to NYCHHC, 138 pounds and 118 pounds respectively, and opines that the hospital's failure to implement adequate nutritional support is

19

responsible for the difference. The expert views this discrepancy as indication that Decedent was not properly nourished while under NYCHHC's care and opines that had she been deemed high risk for malnutrition and afforded the proper supplements, they would have promoted weight gain and helped heal her wounds.

Plaintiff also submits an expert affirmation from a physician licensed to practice medicine in the State of New York, [name of expert redacted], with experience treating and developing preventative treatment plans for pressure ulcers. The unredacted, signed expert affirmations were presented to the Court for *in camera* inspection. Plaintiff's physician expert opined solely as to the physician's standard of care and proximate causation.

Plaintiff's physician expert also asserts that Decedent's injuries were not pre-existing but instead hospital-acquired, drawing support from medical records which indicate that the first time each wound was documented was at NYCHHC Coney Island Hospital.

Plaintiff's physician expert opines that while Decedent had prior medical conditions that made her more susceptible to pressure ulcers, those prior conditions did not make the ulcers she developed unavoidable and did not make her incapable of healing from the wounds that developed. Plaintiff's physician expert further opines that Decedent's prior medical history should have caused the NYCHHC staff to pay her greater attention because of how susceptible she was to these injuries, and that the Coney Island Hospital staff deviated from good and accepted medical practice by being aware of the patient's conditions but failing to be proactive and preventative with their care. In the expert's view, this deviation proximately caused the development and deterioration of Decedent's pressure ulcers.

In response to Dr. Diamond's claims that debridement procedures were unnecessary and that any claims of failure to treat infected wounds are false, Plaintiff's physician expert opines

20

that while the chart indicates that antibiotics were prescribed for the urinary tract infection, the NYCHHC records "fail to indicate that infection management control was part of her treatment."

Plaintiff's physician expert also opines on NYCHHC's alleged failure to document the wounds and interventions, and how it affected Decedent's subsequent caregivers' ability to adequately treat her. In their view, the alleged lack of documentation caused Decedent's injuries to progress and worsen, and the discrepancy in the records "calls the veracity of the entire hospital record in question."

In response to Dr. Diamond's assertions regarding Decedent's wound progression, Plaintiff's physician expert opines that the wound documentation "clearly discusses the pressure ulcers and deep tissue injuries increasing in length, width, and depth" during Decedent's admission. Plaintiff's physician expert also addresses Dr. Diamond's discussion of Decedent's access to specialty surfaces, opining that a specialty air-loss mattress was documented as an intervention pending for signature throughout her admissions but there is no indication that the mattress was actually provided.

As to Decedent's alleged malnutrition at NYCHHC Coney Island, Plaintiff's physician expert counters the opinion of the movant's expert that there was no way to prevent her malnutrition due to chronic illness. The expert states that although Decedent's comorbidities placed her at high risk of malnutrition, she was not assessed and treated appropriately. The physician expert notes the discrepancy in albumin levels and opines that patients with pressure ulcers and deep tissue injuries require increased nutritional support. The expert opines that the hospital's failure to appreciate Decedent's nutritional needs caused her condition to worsen.

Finally, regarding the wrongful death claim, Plaintiff's physician expert states that Decedent's pressure ulcers led "to her eventual death." The expert states with no further detail

21

that "had the pressure ulcers and skin impairments not developed, Plaintiff's decedent likely would have lived a longer life."

The Court finds that Plaintiff's expert fails to raise an issue of fact as to the claims of medical malpractice regarding Decedent's first admission to NYCHHC Coney Island Hospital from July 31-August 6, 2020. It is undisputed by Plaintiff that Decedent did not develop any pressure ulcers during this first admission, and there was no alleged deviation from the standard of care and resultant injury which occurred on those dates. Accordingly, NYCHHC's motion for summary judgment is granted as to any claims from the first admission, July 31-August 6, 2020.

Regarding Decedent's second admission to the hospital from November 22, 2020, to December 2, 2020, Plaintiff's experts each opine that Decedent's pressure ulcers were all acquired at NYCHHC Coney Island Hospital during this time as a result of inadequate care rendered by the hospital staff. Conversely, Defendant's expert opines that the stage II sacral pressure ulcer and right heel redness were present from her admission, although they were first documented on November 23, 2020, by Nurse Borys. There remain issues of fact as to when these pressure ulcers developed. Furthermore, it is clear from the record that both the sacral and right heel ulcer *worsened* during her ten-day stay at Coney Island Hospital, evidenced by the documentation of their deterioration. Decedent's right heel injury developed into a deep tissue injury by the end of her second admission to NYCHHC, according to Coney Island Hospital records from December 1, 2020, and Sea Crest records from December 4, 2020. Moreover, Decedent's sacral pressure ulcer, which was recorded as stage II on November 23, 2020, was reclassified as stage III upon her admission to Sea Crest on December 4, 2020.

Defendant's expert opines that the fact that the right heel injury and sacral pressure ulcer were reclassified as a deep tissue injury and stage III wound respectively does not necessarily

22

[* 22]

mean the hospital departed from any standard of care. However, these statements are conclusory and fail to address the deterioration of the pressure ulcers.

Additionally, Plaintiff's nursing expert notes that Decedent's pressure ulcers of the left and right buttock were first recorded upon her readmission to Sea Crest on December 2, 2020, indicating that they developed during her time at NYCHHC from November 22, 2020, through December 2, 2020.

Whether the pressure ulcers originated at Sea Crest and were "pre-existing" relative to NYCHHC, or originated at NYCHHC and were "hospital acquired," is a question of fact requiring jury resolution which cannot be determined by the record as a matter of law. As for whether the treatment of the pressure ulcers proximately caused them to progress and deteriorate, Plaintiff's physician expert raises issues of fact which counter the movant's expert.

Defendant's and Plaintiff's experts also disagree as to whether there was a failure to consistently assess and document the patient's wounds in compliance with the standard of care during both the second admission (November 28-December 2) and third admission (December 6-18). Plaintiff's experts raise issues of fact as to whether she was improperly discharged to Sea Crest with a low-risk Braden Score and inaccurate information on the skin impairments in her chart ("none"), and whether she was timely provided a pressure-relieving air mattress and other interventions.

On the issue of proximate causation, Plaintiff's medical expert has sufficiently offered opinions to raise issues of fact as to whether these departures from the standard of care were a proximate cause of the decedent's development and worsening of pressure ulcers.

For these reasons, the Court finds that Plaintiff's experts have raised issues of fact which preclude summary judgment as to NYCHHC's alleged departures from the standard of care and

23

[* 23]

proximate causation of her pressure injuries. Summary judgment on the medical malpractice claims arising in November-December 2020 is therefore denied.

Turning to Plaintiff's wrongful death claims, Plaintiff's physician expert claims that the care rendered to Decedent contributed to the development of the pressure ulcers, and that those injuries led to Decedent's "wrongful death," but the expert offers no support for these assertions. Plaintiff's physician expert states in a conclusory and speculative manner that "had the pressure ulcers and skin impairments not developed, Decedent likely would have lived a longer life," and follows with further discussion relating to standard of care, rather than support for this claim. This opinion is speculative, conclusory, and fails to provide any evidence countering the movant's expert opinion that the pressure ulcers did not contribute to Decedent's passing on June 11, 2021 from cardiac arrest, several months after her last admission to Coney Island Hospital. NYCHHC's motion for summary judgment is therefore granted on the wrongful death claim.

The movants also argue as a matter of law that Plaintiff cannot maintain a cause of action against NYCHHC for negligent hiring, retention, supervision, or credentialing, as this is an alternative theory of liability in the absence of a "scope of employment" relationship. "[W]here an employer is liable for the employee's negligence under the theory of respondeat superior, the plaintiff may not proceed with a cause of action to recover damages for negligent hiring and retention" (*Tabchouri v. Hard Eight Restaurant Company, LLC*, 219 AD3d 528, 533 [2d Dept 2023], quoting *Ashley v. City of New York*, 7 AD3d 742 [2d Dept 2004]).

It is undisputed by the parties that NYCHHC was the employer of its staff and that they are vicariously liable to the extent those people are found liable for malpractice. Plaintiffs raise no issue of fact or opposition on this issue. Therefore, the cause of action for negligent hiring, retention, supervision, or credentialing is therefore inapplicable to the facts in the record.

24

[* 24]

Likewise, the movant argues that Plaintiff's cause of action asserting lack of informed consent must be dismissed as a matter of law. In a cause of action to recover damages based upon a claim of lack of informed consent, the plaintiff must allege that there was some "affirmative violation of physical integrity" (*see S.W. v. Catskill Regional Med. Ctr.*, 211 AD3d 890, 891 [2d Dept. 2022]; Public Health Law § 2805-d [2]). It is well established that where a plaintiff's claims arise from an alleged failure to treat a condition appropriately, rather than an affirmative procedure or treatment, this cause of action is not applicable.

Plaintiff raises no issues of fact or opposition to this issue, and accordingly, summary judgment is granted to NYCHHC on the lack of informed consent claim.

Finally, the movant argues that any claims grounded in Public Health Law § 2801-d must be dismissed against NYCHHC, as this statute "only applies to nursing homes" and not hospitals (*Novick v S. Nassau Communities Hosp.,* 136 AD3d 999 [2d Dept 2016]). Plaintiff does not oppose the part of the motion seeking to dismiss any Public Health Law § 2801-d claims against NYCHHC, and those claims are dismissed.

Accordingly, it is hereby:

**ORDERED** that NYCHHC Coney Island Hospital's motion (Seq. No. 6) for an Order, pursuant to CPLR § 3212, granting summary judgment in their favor and dismissing Plaintiff's complaint against them is **GRANTED TO THE EXTENT** of dismissing any claims from Decedent's July 31-August 6, 2020 admission, dismissing the claims of wrongful death against NYCHHC, and dismissing the claims of lack of informed consent, negligent hiring/retention/supervision/training, and deprivation of rights under Public Health Law § 2801-d

25

[* 25]

against NYCHHC, and the motion is otherwise **DENIED.**

This constitutes the decision and order of the Court.[1]

**ENTER.**

**Hon. Consuelo Mallafre Melendez**

**J.S.C.**

---

[1] This decision was drafted with the assistance of legal interns Lorena Flores and Jack Widor, Brooklyn Law School.